## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

IN RE CATERPILLAR INC.      )      **C.A. No. 12-CV-1076-LPS**
DERIVATIVE LITIGATION     )      **(Consolidated Action)**

## VERIFIED CONSOLIDATED COMPLAINT

Plaintiffs City of Lansing Police and Fire Retirement System and Asbestos Workers Philadelphia Pension Fund ("Plaintiffs") allege, upon information and belief based upon, *inter alia*, the investigation made by and through their attorneys, except as to those allegations that pertain to the Plaintiffs themselves, which are alleged upon knowledge, as follows:

## INTRODUCTION

1.     Plaintiffs bring this action derivatively on behalf of Caterpillar Inc. ("Caterpillar" or the "Company") against the Company, the Company's board of directors (the "Board"), and certain executive officers for breach of fiduciary duty of disclosure, waste of corporate assets, and unjust enrichment.

2.     On April 29, 2011 and May 2, 2012, respectively, the Company furnished to its stockholders the Notice of Annual Meeting of Stockholders (the "2011 Notice") and the 2011 Proxy Statement (the "2011 Proxy Statement"), and the Notice of Annual Meeting of Stockholders (the "2012 Notice") and the 2012 Proxy Statement (the "2012 Proxy Statement" and, collectively with the 2011 Proxy Statement, the "Proxy Statements"), respectively, that were false and misleading and omitted material information. The Proxy Statements represented to the stockholders that the executive compensation under the Caterpillar Inc. 2006 Long-Term Incentive Plan (the "LTIP") and the Amended and Restated Caterpillar Inc. Executive Short-

211825v2

Term Incentive Plan (the "ESTIP" and, collectively with the LTIP, the "Plans") were expected to qualify as performance-based compensation under 26 U.S.C. § 162(m) ("§ 162(m)") and therefore were tax-deductible.  However, this representation was materially false and misleading because the Plans fail to comply with § 162(m) and its relevant regulation for allowance of deductibility.

3.     The Board breached its fiduciary duty of loyalty and care by issuing the Proxy Statements containing materially false and misleading statements and omissions.  The Proxy Statements also tainted the stockholder votes for those directors who were up for re-election for 2011 and 2012.

4.     In addition, by adopting defective § 162(m) compensation Plans, the Company is essentially forfeiting significant tax deductions.  This behavior is important information for stockholders in that it increases the Company's agency costs and information risk.

5.     By not having compliant incentive compensation plans, the Board members have committed, and will continue to commit, corporate waste.  Having decided to provide tax-deductible senior executive compensation, there is no reason not to implement compliant compensation plans that preserve corporate assets by avoiding unnecessary tax liability.

6.     The members of the Board and certain executive officers have unjustly enriched themselves by taking compensation that is not tax-deductible and not sufficiently disclosed to the stockholders, to the detriment of the Company.

7.     Plaintiffs seek, for relief, corrected disclosures by means of new proxy statements, a new stockholder vote for the election of directors, and an equitable accounting with disgorgement of the compensation that was paid to the defendants pursuant to the defective Plans.

## JURISDICTION

8.      The jurisdiction of this Court is founded upon: (a) federal question jurisdiction pursuant to 28 U.S.C. § 1331 and § 1340, (b) supplemental jurisdiction, 28 U.S.C. § 1367(a), and (c) diversity of citizenship, 28 U.S.C. § 1332.   Plaintiff is a citizen of the Commonwealth of Pennsylvania.   The defendants are all citizens of jurisdictions other than Pennsylvania.   The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      The claims herein arise under Federal and Delaware laws and, in part, depend upon the construction and effect of § 162(m) and Treas. Reg. § 1.167-27.   The meaning of these federal tax provisions is an important issue of federal law that belongs in federal court.   *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 312-15 (2005).

10.      This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

## PARTIES

11.      Plaintiffs City of Lansing Police and Fire Retirement System and Asbestos Workers Philadelphia Pension Fund are stockholders of the Company and were stockholders at the time of the wrongs alleged herein, and have been such continuously since then.

12.      Caterpillar is a corporation organized under the laws of the State of Delaware. The Company's last fiscal year ended December 31, 2011.   On March 31, 2012 it had 652,337,920 shares of common stock issued and outstanding.   The Company's stock is traded on the New York Stock Exchange under the ticker symbol CAT.   Caterpillar is the world's largest manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines, and diesel-electric locomotives worldwide.   The Company also sells financial

products and insurance to customers via a worldwide dealer network.  Caterpillar's principal place of business is at 100 NE Adams Street, Peoria, Illinois 61629.

14.   Defendant David L. Calhoun ("Calhoun") has been on the Company's Board since 2011 and is a member of the Compensation Committee.  Calhoun is currently the Executive Director of Nielsen Holdings N.V.

14.   Defendant Daniel M. Dickinson ("Dickinson") has been on the Board since 2006 and is a member of the Audit Committee.  Dickinson is a Managing Partner of HCI Equity Partners.

15.   Defendant Eugene V. Fife ("Fife") has been on the Board since 2002 and is a member of the Governance Committee.  Fife is the Managing Principal of Vawter Capital LLC and a Retired Partner of Goldman Sachs & Co.

16.   Defendant Juan Gallardo ("Gallardo") has been on the Board since 1998 and is a member of the Public Policy Committee.  Gallardo is the Chairman of Grupo Embotelladoras Unidas S.A.B. de C.V. and is a resident of Mexico.

17.   Defendant David R. Goode ("Goode") has been on the Board since 1993 and a member of the Compensation Committee.  Goode is the former Chairman, President and CEO of Norfolk Southern Corporation.

18.   Defendant Jesse J. Greene, Jr. ("Greene") has been on the Board since 2011 and is a member of the Audit Committee.  Greene is the former Vice President of Financial Management and Chief Financial Risk Officer of International Business Machines Corporation

19.   Defendant Jon M. Huntsman, Jr. ("Huntsman") was elected to the Board at the 2012 Annual Meeting and is a member of the Public Policy Committee.  Huntsman is the former United States Ambassador to China and former Governor of Utah.

20.     Defendant Peter A. Magowan ("Magowan") has been on the Board since 1993 and is a member of the Governance Committee.  Magowan is the former President and Managing General Partner of the San Francisco Giants and former Chairman and CEO of Safeway Inc.

21.     Defendant Dennis A. Muilenburg ("Muilenburg") has been on the Board since 2011 and is a member of the Public Policy Committee.  Muilenburg is the Executive Vice President of The Boeing Company and President and CEO of Boeing Defense, Space & Security.

22.     Defendant Douglas R. Oberhelman ("Oberhelman") has been the Chairman of the Board and CEO of the Company since 2010.

23.     Defendant William A. Osborn ("Osborn") has been on the Board since 2000 and is a member of the Audit Committee.  Osborn is the former Chairman and CEO of Northern Trust Corporation and The Northern Trust Company.

24.     Defendant James W. Owens ("Owens") was Caterpillar's CEO and Chairman of the Board from February 2004 through 2010.

25.     Defendant Charles D. Powell ("Powell") has been on the Board since 2000 and is a member of the Public Policy Committee.  Powell is the Chairman of Capital Generation Partners, LVMH Services Limited and Magna Holdings and is a resident of the United Kingdom.

26.     Defendant Edward B. Rust, Jr. ("Rust") has been on the Board since 2003 and is a member of the Compensation Committee.  Rust is the CEO and President of State Farm Mutual Automobile Insurance Company.

27.     Defendant Susan C. Schwab ("Schwab") has been on the Board since 2009 and is a member of the Public Policy Committee.  Schwab is a Professor at the University of Maryland School of Public Policy and a strategic adviser for Mayer Brown LLP; former United States Trade Representative.

28.     Defendant Joshua I. Smith ("Smith") has been on the Board since 1993 and a member of the Compensation Committee.  Smith is the Chairman and Managing Partner of the Coaching Group, LLC.

29.     Defendant Miles D. White ("White") has been on the Board since 2011 and is a member of the Governance Committee.  White is the Chairman and CEO of Abbott Laboratories.

30.     Defendants in paragraphs 13-29 are collectively referred to as the Board or the Director Defendants.

31.     Defendant Stuart L. Levenick ("Levenick") is a Group President of Caterpillar. Levenick is responsible for customer and dealer support for the Company.

32.     Defendant Gerard Vittecoq ("Vittecoq") is a Group President and executive office member of Caterpillar.  Vittecoq has administrative responsibility for the Company's growing energy and power systems group.

33.     Defendant Steven H. Wunning ("Wunning") is a Group President of Caterpillar and has administrative responsibility for the Resource Industries Group.

34.     Defendants in paragraphs 31-33 plus Defendant Oberhelman are referred to as the "Officer Defendants," and, collectively with the Director Defendants, the "Individual Defendants."  The Officer Defendants are "Covered Employees" as defined in § 162(m)(3) and Treas. Reg. § 1.162-27(c)(2) and Named Executive Officers as defined in 17 C.F.R. § 229.402(a)(3) ("NEOs").

35.     All Individual Defendants are eligible to participate in the LTIP.

36.     All Officer Defendants are eligible to participate in the ESTIP.

## SUBSTANTIVE ALLEGATIONS

### Requirements for Tax-Deductibility Under IRC § 162(m) and Treas. Reg. § 1.162-27

37.     IRC § 162(m) imposes a $1 million annual limit on the amount a publicly held corporation may deduct for compensation paid to a Covered Employee (defined below).  The same provision allows for an exception to this limit for compensation that qualifies as "performance-based" as defined by § 162(m) and the regulations promulgated thereunder.  Whereas § 162(a)(1) allows a public company to obtain, as an income tax deduction, "a reasonable allowance for salaries or other compensation for personal services actually rendered" by its employees, § 162(m) imposes restrictions on that deduction for the compensation of the Company's Covered Employees.  The Covered Employees, as defined in § 162(m)(3), are the CEO and the other "four highest compensated officers."  Treas. Reg. § 1.162-27(c)(2).  In order for that compensation in excess of $1 million to qualify for the exception under § 162(m), the Plan must comply with the requirements of § 162(m) and 26 C.F.R. § 1.162-27 ("Treas. Reg. § 1.162-27").

38.     Congress enacted § 162(m) not as a revenue device, but as an instrument of corporate governance and part of its effort to regulate corporate affairs in favor of stockholders and other investors.  In particular, it is designed to be a counterweight to the policies of many states to regulate corporations in favor of officers, directors, and other insiders.  As the Joint Committee on Taxation stated: "The $1 million deduction limitation reflects corporate governance issues regarding excessive compensation, rather than issues of tax policy."  Joint Committee on Taxation, Report of Investigation of Enron Corporation and Related Entities Regarding Federal Tax and Compensation Issues and Policy Recommendations, 2003 WL

25599037 n.2211 and accompanying text (2003).   As a part of the Tax Code, § 162(m) is construed like other Tax Code provisions.

39.    § 162(m) provides that compensation paid to a public company's Covered Employees will be tax-deductible, but only up to $1 million, *unless* the compensation is paid solely for attaining one or more *objective* performance goals.   To qualify for the deduction, the performance goals must: (i) be determined by an independent two-or-more-member compensation committee of the board of directors; (ii) along with the applicable corporate officers' compensation package, be disclosed to, and approved by, a shareholder majority vote; and (iii) be certified by the independent compensation committee as being met before any compensation is paid.   Treas. Reg. § 1.162-27(e).

40.    The Director Defendants breached their fiduciary duties of disclosure by falsely representing in the Proxy Statements the tax-deductibility of the compensation paid pursuant to the Plans to the Covered Employees for fiscal years ending 2010 and 2011.   As alleged below, none of the compensation in excess of $1 million annually paid or to be paid to Covered Employees was or is tax-deductible, and the Plans are not designed to allow for tax-deductibility.

41.    The 2011 Proxy Statement represented that "Caterpillar has generally structured performance-based compensation plans with the objective that amounts paid under those plans will be tax deductible."   The 2012 Proxy Statement represented that "[s]ubstantially all 2011 NEO compensation is expected to qualify as performance-based compensation under Section 162(m) or otherwise not exceed $1 million, except RSUs (i.e., restricted stock units) granted under the Chairman's Award program and the CEO's base salary."   As shown below, both of these statements were materially false and misleading.

*The Plans Violate Section 162(m) and the Treasury Regulation and Therefore Are Not Tax-Deductible*

## The LTIP

42.   The LTIP never became effective because the stockholders never properly approved it at the 2006 Annual Meeting.  Nevertheless, on June 9, 2010, the Board sought and received stockholder approval of amendments to the LTIP (2010 Proxy Statement at 21) at the 2010 Annual Meeting.

43.   The LTIP purportedly permits the grant of the following types of awards: (i) Nonqualified Stock Options, (ii) Incentive Stock Options, (iii) Stock Appreciation Rights ("SARs"), (iv) Restricted Stock, and (v) Performance Shares or Performance Units.

44.   However, the LTIP failed to state, with the requisite meaningful specificity, the material terms and provisions under which the incentive compensation is to be paid.  The House Conference Report, reciting the intent of Congress in passing § 162(m)(4)(C)(ii), states:

> In developing standards as to whether disclosure of the terms of a plan or agreement is adequate, the Secretary [of the Treasury] should take into account the SEC rules regarding disclosure.  To the extent consistent with those rules, however, disclosure should be *as specific as possible . . . .*  For example, it would not be adequate if the shareholders were merely informed that an executive would be awarded $x "if the executive meets certain performance goals established by the compensation committee."

H.R. Conf. Rep. 103-213, at *588, 1993 WL 302291 (Aug. 4, 1993).  The Treasury Regulations expressly refer to the applicability of the SEC regulations.  *See* Treas. Reg. § 1.162-27(e)(4)(v).

45.   While a general description of the business criteria upon which the performance goals may be based need not be a specific articulation of the measures to be used, compensation plans must be informative enough for the stockholder who is voting for the plan to know and understand the performance criteria they are approving.  Treas. Reg. § 1.162-27(e)(4) mandates that the "description of the business criteria on which the performance goal is based" must be

disclosed.  Moreover, each performance criterion needs to be objective, which, pursuant to the Treasury Regulation, is satisfied only "if a third party having knowledge of the relevant facts could determine whether the goal is met."  Treas. Reg. § 1.162-27)(e)(2)(i).

46.     The LTIP contains significant flaws so as to disqualify any compensation paid pursuant to the plan from the tax deduction. The LTIP offers a laundry list of fourteen performance metrics that could determine executive compensation.  Some of these metrics are unacceptable pursuant to the Regulation.  For example, the last and most egregious metric is as follows:

*"any individual performance objective which is measured solely in terms of quantifiable targets related to the Company or the businesses of the Company."*

This criterion clearly does not satisfy the Regulation's requirement for specificity and objectivity, as it is essentially a blanket or catch-all measure allowing the Compensation Committee unfettered discretion to decide on unknown and undisclosed business criteria. Indeed, it does precisely what the House Conference Report says not to do.

47.     Similarly, "earnings before interest, taxes, depreciation, and/or amortization" ("EBITDA"), another business metric that the Compensation Committee may use, is not an objective measure and does not satisfy the Regulation's requirement.  EBITDA is net income with interest, taxes, depreciation, and amortization added back to it.  This is a non-GAAP measure that allows a greater amount of discretion as to what is (and is not) included in the calculation. This also means that companies often change the items included in their EBITDA calculation from one reporting period to the next.  "Net operating profits after taxes" ("NOPAT") is also not objective.  NOPAT is derived by a number of methods to calculate a profit number,

using adjustments such as reclassifying some expenses as investments.  There is no way for a stockholder to know how a company will choose to calculate its NOPAT figures.

48.     Because of the omission of material information regarding the Plan's performance criteria, shareholders are left without a way to determine how difficult it will be for the executive or how likely it will be for the Company to achieve the undisclosed targets.

49.     Moreover, the objective performance criteria need to be pre-established, as defined in Treas. Reg. § 1.162-27(e)(2)(i).  Under the Treasury Regulations,

> [q]ualified performance-based compensation must be paid solely on account of the attainment of one or more preestablished, objective performance goals.  A performance goal is considered preestablished if it is established in writing by the compensation committee no later than 90 days after the commencement of the period of service to which the performance goal relates, provided that the outcome is *substantially uncertain* at the time the compensation committee actually establishes the goal.  However, in no event will a performance goal be considered to be preestablished if it is established after 25 percent of the period of service has elapsed.

*Id.*  (emphasis added).

This means that if the Compensation Committee uses a performance period equal to or greater than one year for the LTIP, then it will have 90 days from the beginning of the year to set the goals.  However, if it chooses a performance period of less than one year, then it will only have until 25 percent of the period has elapsed in which to set the performance goals.

50.     The LTIP defines a "Performance Period" as "the time period during which performance goals must be achieved with respect to an Award, as determined by the Committee." 2010 Proxy Statement at 73.  This means that the length of the Performance Period can be as short as a day, or any other length that could possibly render the outcome to be not substantially uncertain.  For example, under the definition of Performance Period, the Compensation Committee can decide that the compensation be measured by pre-tax income

reaching a certain amount in 30 days. This outcome is not substantially uncertain because the Compensation Committee can easily foresee the outcome and manipulate the metrics in the short term.

51.     The Treasury Regulation also mandates disclosure of either the maximum amount of compensation that could be paid to any employee or the formula used to calculate the amount of compensation to be paid to the employee if the performance goal is attained. The LTIP disclosed the maximum shares subject to awards of stock options, SARs, restricted shares, and performance shares under the Plan to be 800,000 shares per year per participant, and the maximum amount that may be paid in cash is $5,000,000. Based on the stock price of Caterpillar on the date of the issuance of the 2012 Proxy Statement, which was $102.77, each participant is accordingly eligible to receive as much as $87,216,000.00 under the LTIP. This astronomical number, if it is a true maximum, shocks the conscience as to the amount of corporate waste the Board may commit. If the Plan does not actually intend to award compensation close to this amount, then the artificial maximum does not adequately inform the stockholder what each participant may realistically receive pursuant to Treas. Reg. § 1.162-27(e)(4), rendering the requirement meaningless. Treas. Reg. § 1.162-27(e)(4)(iv) states that "[d]isclosure as to the compensation payable under a performance goal must be specific enough so that shareholders can determine the maximum amount of compensation that could be paid to any employee during a specified period."

52.     Finally, under Treas. Reg. § 1.162-27(e)(4)(vi), if the compensation committee has the authority to change the targets under the performance goals, in order for the payments to be tax-deductible, stockholders must reapprove the performance criteria at least every five years after their initial approval for the payments to be tax-deductible.

53.     The Caterpillar performance Committee does have the authority to change the targets under the performance goals.  Therefore, stockholders were required to reapprove the performance goals on or before the 2011 Annual Meeting.  However, no such timely shareholder reapproval was properly obtained.  Rather, the Board sought reapproval only of the ***amendments*** to the LTIP at the 2010 Annual Meeting, not reapproval for the full Plan and the performance measures set forth therein.  Because the Board did not seek and obtain stockholder reapproval of the LTIP by 2011, none of the compensation paid for fiscal years ended 2011, or to be paid for fiscal year ending 2012, to the Covered Employees in excess of $1 million per year was or will be properly tax-deductible.

**The ESTIP**

54.     On June 8, 2011, the Board sought and received stockholder approval of the ESTIP (2011 Proxy Statement at 17) at the 2011 Annual Meeting.  The ESTIP had become effective as of January 1, 2011.

55.     All executive officers of the Company are eligible to participate in the ESTIP.

56.     The ESTIP permits the grant of Performance Awards.

57.     Similar to the LTIP, the ESTIP offers a laundry list of sixteen performance metrics that could determine executive compensation, including this same metric:

*"any individual performance objective which is measured solely in terms of quantifiable targets related to the Company or the businesses of the Company."*

This criterion clearly does not satisfy the Regulation's requirement for objectivity as it is essentially a blanket or catch-all measure allowing the Compensation Committee unfettered discretion to decide on unknown and undisclosed business criteria.

58.     Because of the omission of material information from the 2011 Proxy Statement regarding the performance criteria in the ESTIP, shareholders were therefore left without a way to determine how difficult it will be for the executive or how likely it will be for the Company to achieve the undisclosed targets.

**The Director Defendants Issued Materially False or Misleading Proxy Statements**

59.     The Director Defendants authorized the distribution of the Proxy Statements by means of which they solicited the proxies of the Company's stockholders for, *inter alia*, the election of directors in 2011 and 2012, and for the restatement and amendment of the ESTIP in 2011.

60.     The Proxy Statements misrepresented the tax-deductibility of compensation paid to the Officer Defendants pursuant to § 162(m) and the Treasury Regulations promulgated thereunder.

61.     The 2012 Proxy Statement states, in pertinent part, "Substantially all 2011 NEO compensation is expected to qualify as performance-based compensation under Section 162(m)." 2012 Proxy Statement at 43.  This statement is materially false and misleading because as shown above, none of the 2011 compensation qualifies under Section 162(m) for tax-deductibility.

62.     The 2011 Proxy Statement states, in pertinent part, "Caterpillar has generally structured performance-based compensation plans with the objective that amounts paid under those plans will be tax deductible." 2011 Proxy Statement at 56.  The 2011 Proxy Statement also stated that "[t]he [ESTIP] is intended to comply with section 162(m)," in proposing that stockholders vote for the material terms of the ESTIP.  These statements are materially false and misleading, as the ESTIP are not structured to qualify for tax-deductions under § 162(m).

63.     Given the defects in the Plans, the Proxy Statements were materially false in representing that the Plans complied with § 162(m) and that the compensation paid to the Covered Employees was or will be tax-deductible.

64.     To the extent that the Treasury Regulations are supplemented by the SEC Regulations, Treas. Reg. § 1.162-27(e)(4)(v), Regulation S-K requires that a proxy statement either disclose the targets or discuss how difficult it will be for the Company to achieve the undisclosed target levels.  17 C.F.R. § 229.402 (Instruction 4).  Moreover, the proxy statement must also disclose how non-GAAP target levels are calculated from the audited financial statements.  17 C.F.R. § 229.402 (Instruction 5).  As described above, the Proxy Statements do not disclose how the performance goals are measured, and the Company's audited financial statements do not disclose how they are measured.

65.     Under Delaware law, the fiduciary duties of directors require that they disclose fully and with complete candor all material facts when they solicit proxies from stockholders. The Director Defendants breached those duties by failing to disclose the tax implications of the non-tax-deductible Plans in the Proxy Statements.   This information is material, as the information goes to independence and interest of the Director Defendants, and stockholders would regard this information material when deciding how to vote.

66.     Moreover, when directors undertake voluntarily to provide information to stockholders, a fiduciary duty exists to provide truthfully and candidly all material facts.

67.     Because the Plans are invalid and defective, such awards will subject the Company to millions of dollars in unnecessary tax liability.   The Board's payment of compensation that is not properly tax-deductible constitutes waste of corporate assets. Unnecessary tax payments constitute waste because the Company is under no duty to structure a

compensation plan that will incur federal taxes.  § 162(m) is a tool Congress utilizes to regulate executive compensation and to assure that it is aligned with performance.  The adoption of such defective Plans is a complete failure of corporate governance.

68.     Under Delaware law, the Officer Defendants owe the Company the same fiduciary duties as do the Director Defendants.  All the Director Defendants and Officer Defendants owe fiduciary duties to the Company not to take improperly paid compensation, such as awards under compensation plans that were insufficiently disclosed to the stockholders. Acceptance of such payments constitutes unjust enrichment.

69.     The aforesaid breach of duties of loyalties and good faith and the misrepresentations and omissions in the Proxy Statements have caused, and are continuing to cause, injury to the Company and its stockholders.

## DEMAND ALLEGATIONS

70.     Substantive requirements of demand are governed by the law of Caterpillar's state of incorporation -- Delaware.

71.     Plaintiffs have not made any demand on the Company's Board to institute this action because doing so would be a futile act.

72.     The entire Board is interested in the transactions and events alleged herein.  All of the members of the Board are eligible to participate in the LTIP and are thus interested under Delaware law.  Their interest lies in the fact that each director is entitled to receive a personal financial benefit that is not equally shared by the stockholders, and seeking stockholder votes for approval of the amendment of the LTIP constituted a self-dealing transaction.

73.     Demand is also excused because the acts alleged herein are not acts of sound business judgment.  The demand requirement and its exceptions are to encourage intra-corporate resolutions of disputes and to obtain the business judgment of the board of directors on whether

the litigation is in the best interest of the corporation and its shareholders.  However, where, as here, a stockholder sues the board of directors over an act that is not a decision concerning the management of the business and affairs of the corporation, but one of disclosure, the business judgment rule does not apply.  Delaware law excuses demand whenever the challenged act of the board is not the product of a valid exercise of business judgment, regardless of whether a majority of the board is disinterested or independent.  Here, the Board's conduct concerning the misrepresentations and omissions in the Proxy Statements is not a matter of business judgment, and therefore not protected by the business judgment rule for the following reasons:

(a)     When, for the stockholders' annual meeting, a corporate board solicits stockholders' votes for the election of directors and for the approval of the actions of the board and its committees, the board owes the stockholders a duty of full and fair disclosure meaning that all material facts must be fully and fairly disclosed, and no material facts may be omitted. This duty of disclosure is a thing apart from the duty and authority to deal with the business and property of the corporation.  Courts give deference to a corporate board of directors as to questions of management of the corporation's business only, but not as to questions of the board's performance of its disclosure duties.  This is because a board's decision, even in good faith, to misstate or to omit a material fact cannot be defended on the grounds that reasonable persons could differ on the subject.  In addition, although courts may not be well suited to making business decisions, courts are well-suited to deciding questions concerning the quality of, and circumstances surrounding, disclosures.

(b)     the Proxy Statements contains materially false or misleading statements and omissions concerning the tax-deductibility of payments under the LTIP and the standards and variables for determining compensation under the LTIP.  Enticing shareholders to vote their

- 17 -

shares based upon a false and misleading statement and/or omissions for a Plan in which the directors are self-interested and entitled to receive compensation could not be the product of the valid exercise of business judgment.

74.     The Director Defendants had the tools at hand, *i.e.*, complying with § 162(m) and the Treasury Regulations, to obtain a tax deduction on the qualified compensation and to properly disclose the same.   Instead, they produced two defective compensation plans that -- shareholders were informed -- were supposedly designed and structured to receive such tax-deductions as well as ensuring that the compensation will reward performance, but failed to accomplish this task.   Payments of such non-tax-deductible compensation constitute waste, which is not protected by the business judgment rule, and therefore, demand is excused.

75.     The unrealistic maximum amount of compensation payable under the Plans to the participants is so great that it not only constitutes waste, but shocks the conscience.  The Board's adoption of the LTIP is cause to excuse demand.

## COUNT I

### Breach of Fiduciary Duty of Disclosure
### (Derivative Claim On Behalf of the Company Against Director Defendants)

76.     Plaintiffs reallege the preceding paragraphs as set forth and incorporate them herein by reference.

77.     The acts of the Director Defendants in distributing the false and misleading Proxy Statements have injured the Company by interfering with proper corporate governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors and for the amendment and restatement of the ESTIP.

78.     The acts of the Director Defendants in distributing the false and misleading Proxy Statements also have injured the Company by misrepresenting the tax deductibility of the LTIP.

79.     The Director Defendants also owe the Company and its stockholders a duty of candor when they voluntarily disclose material information.

80.     As a result of these actions of the Director Defendants, the Company has been and will be damaged.

81.     Plaintiffs have no adequate remedy at law.

82.     The Court should require the Director Defendants to distribute to the Company's stockholders corrected disclosures for 2011 and 2012 and to re-solicit proxies.

## COUNT II

### Waste of Corporate Assets
### (Derivative Claim On Behalf of the Company Against the Individual Defendants)

83.     Plaintiffs reallege the preceding paragraphs as set forth above and incorporates them herein by reference.

84.     The Director Defendants' payment of non-tax-deductible compensation under the Plans to the Officer Defendants, and the Officer Defendants' acceptance of the same have been or will be irrational and constitute waste, and injure the Company by causing it to lose tax benefits and by subjecting the Company to needless tax liability.

85.     The Director Defendants approved the Plans and the amendments to the Plans, which provides for maximum payments in amounts so excessive, that no officer or director of ordinary sound business judgment would award them so as to constitute waste.

86.     As a result of these actions of the Individual Defendants, the Company has been and will be damaged.

87.     Plaintiffs have no adequate remedy at law.

88.     Termination of the Plans, an injunction, an equitable accounting with disgorgement, and reimbursement to the Company are required to redress the injury.

- 19 -

## COUNT III

### Unjust Enrichment
### (Derivative Claim On Behalf of the Company Against the Individual Defendants)

89.     Plaintiffs reallege the preceding paragraphs as set forth above and incorporates them herein by reference.

90.     The Individual Defendants have been or will be unjustly enriched as a result of their acceptance of bonuses under compensation plans that were insufficiently disclosed to the stockholders.  The Individual Defendants' acceptance of such improperly paid compensation has or will constitute unjust enrichment.

91.     As a result of the actions of the Individual Defendants, the Company has been and will be damaged.

92.     Plaintiffs have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectively pray for the following relief:

A.      For an order declaring void the votes of the stockholders for 2011 and 2012;

B.      For an order terminating the Plans and an injunction against payments under them;

C.      For an order requiring equitable accounting, with disgorgement, in favor of the Company for the losses that it has sustained and will sustain by virtue of the conduct alleged herein;

D.      For an order awarding Plaintiffs costs and disbursements of this action, including reasonable accountants', experts', and attorneys' fees; and

E.      Granting such additional, similar, or different relief that the interests of justice or equity may require.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:     November 16, 2012

Of Counsel

Paul F. Novak
**MILBERG LLP**
One Kennedy Square
777 Woodward Avenue, Suite 890
Detroit, Michigan 48226
(313) 309-1760

Benjamin Y. Kaufman
Kent A. Bronson
Gloria Kui Melwani
**MILBERG LLP**
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300

Brigham Smith
City Attorney
City of Lansing
124 W. Michigan Avenue
Lansing, Michigan 48933
(514) 483-4320

BARRACK, RODOS & BACINE
Alexander Arnold Gershon
425 Park Avenue - 31st Floor
New York, New York 10022
Telephone:  (212) 688-0782

BARRACK, RODOS & BACINE
Daniel E. Bacine
2001 Market Street
Philadelphia, Pennsylvania 19103
Telephone:  (215) 963-0600

**FARNAN LLP**

/s/ Brian E. Farnan
Joseph J. Farnan, Jr. (Del. Bar No. 100245)
Joseph J. Farnan, III (Del. Bar No. 3945)
Brian Farnan (Del. Bar No. 4089)
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301

*Attorneys for Plaintiffs*
*City of Lansing Police and Fire Retirement*
*System and Asbestos Workers Philadelphia*
*Pension Fund*