## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE CATERPILLAR INC.  
DERIVATIVE LITIGATION

)
)
)
)

Civil Action No. 12-1076-LPS-CJB  
Consolidated Action

### REPORT AND RECOMMENDATION

Presently pending before the Court in this consolidated shareholder derivative action is

the motion ("Motion") of Defendants David L. Calhoun, Daniel M. Dickinson, Eugene V. Fife,

Juan Gallardo, David R. Goode, Jesse J. Green, Jr., Jon M. Huntsman, Jr., Stuart L. Levenick,

Peter A. Magowan, Dennis A. Muilenberg, Douglas R. Oberhelman, William A. Osborn, James

W. Owens, Charles D. Powell, Edward B. Rust, Jr., Susan C. Schwab, Joshua I. Smith, Gerard

Vittecoq, Miles D. White, Steven H. Wunning and Nominal Defendant Caterpillar Inc.

("Caterpillar" or the "Company") seeking to dismiss, pursuant to Federal Rules of Civil

Procedure 23.1 and 12(b)(6), the Verified Amended Consolidated Complaint filed by Plaintiffs

City of Lansing Police and Fire Retirement System ("City of Lansing") and Asbestos Workers

Philadelphia Pension Fund ("Asbestos Workers" and, collectively with City of Lansing,

"Plaintiffs").[1]  (D.I. 21)  For the reasons that follow, the Court recommends that Defendants'

Motion be GRANTED without prejudice.

## I.    BACKGROUND

---

[1]      City of Lansing and Asbestos Workers originally filed two separate but substantially similar derivative actions against Defendants, causing this Court to open two separate actions, Civil Action No. 12-1076-LPS-CJB, entitled *City of Lansing Police and Fire Retirement System v. Calhoun, et al.*, and Civil Action No. 12-1077-LPS-CJB, entitled *Asbestos Workers Philadelphia Pension Fund v. Calhoun, et al.* The actions have since been consolidated, and Civil Action No. 12-1076-LPS-CJB has been designated as the lead case. Unless otherwise noted, citations to docket numbers are to documents that have been filed in the lead case.

## A.    Factual Background[2]

### 1.    The Parties

Plaintiffs are stockholders of Caterpillar who have owned Caterpillar stock at all relevant times for purposes of the instant action.  (D.I. 18 at ¶ 11)

Nominal defendant Caterpillar is a publicly traded company that is incorporated in Delaware and maintains its principal place of business in Peoria, Illinois.  (*Id.* at ¶ 12) Caterpillar is the world's largest manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines, and diesel-electric locomotives.  (*Id.*)  Caterpillar also sells financial products and insurance to customers through a worldwide dealer network.  (*Id.*)

Caterpillar's Board of Directors (the "Board") is currently composed of sixteen directors. That number includes fifteen independent, non-employee directors (Defendants Calhoun, Dickinson, Fife, Gallardo, Goode, Greene, Huntsman, Magowan, Muilenburg, Osborn, Powell, Rust, Schwab, Smith, and White (the "Independent Directors")), as well as Caterpillar's Chief Executive Officer ("CEO") Defendant Oberhelman.  Defendant Owens was Caterpillar's CEO and Chairman of its Board from February 2004 through 2010 (collectively, with the Independent

---

[2]    The following facts are taken primarily from Plaintiffs' Verified Amended Consolidated Complaint and Caterpillar's 2006, 2010, 2011, and 2012 Notices of Annual Meeting and Proxy Statements, which are attached as exhibits to Defendants' Motion. (D.I. 22, ex. A-D)  Generally, courts faced with a motion to dismiss must limit their consideration solely to the complaint's allegations, attached exhibits, documents integral to or explicitly relied upon in the complaint, and matters of public record. *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  Here, the Court may consider the Notices of Annual Meeting and Proxy Statements referenced above, as they are explicitly relied upon in or are otherwise integral to parts of the Verified Amended Consolidated Complaint, and are also public documents that have been filed with the SEC.  (D.I. 18 at ¶¶ 2, 54, 57, 59, 60); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (court may consider, *inter alia*, SEC filings relied upon in complaint); *Seinfeld v. O'Connor*, 774 F. Supp. 2d 660, 666 n.3 (D. Del. 2011) (same).

Directors and Defendant Oberhelman, the "Director Defendants"). (*Id.* at ¶¶ 24, 30; D.I. 22 at 5)

Defendants Oberhelman, Levenick, Vittecoq, and Wunning (the "Officer Defendants"

and, collectively with the Director Defendants, the "Individual Defendants") served as Caterpillar

executive officers during the relevant time period. (D.I. 18 at ¶¶ 22, 31-34) Defendant

Oberhelman has served as Caterpillar's CEO and Chairman of its Board since 2010. (*Id.* at ¶ 22)

Defendant Levenick is a Group President of Caterpillar who oversees customer and dealer

support for the Company. (*Id.* at ¶ 31) Defendant Vittecoq is a Group President and executive

office member of Caterpillar, with administrative responsibility for the Company's energy and

power systems group. (*Id.* at ¶ 32) Defendant Wunning is a Group President of Caterpillar with

administrative responsibility for the Resource Industries Group. (*Id.* at ¶ 33) The Officer

Defendants are "covered employees" as that term is defined in 26 U.S.C. § 162(m)(3) of the

Internal Revenue Code and Treasury Regulation 1.162-27(c)(2); they are also "named executive

officers" ("NEOs") as that term is defined in 17 C.F.R. § 229.402(a)(3). (*Id.* at ¶ 34)

### 2.    Section 162(m)

26 U.S.C. § 162(m) ("Section 162(m)") limits publicly held corporations from deducting

annual compensation over $1 million paid to a "covered employee[,]" defined by the statute as

the corporation's CEO and its other "4 highest compensated officers." 26 U.S.C. §§ 162(m)(1)

& (3). However, Section 162(m) includes an exception to this limit—for compensation that

qualifies as "performance-based[,]" meaning that it is paid "solely on account of the attainment

of one or more performance goals[.]" *Id.* § 162(m)(4)(C). For remuneration to qualify as

"performance-based" compensation, it must also meet the following requirements:  (1) the

performance goals referenced above must be determined by a compensation committee of the

3

corporation's board of directors, comprised solely of two or more outside directors; (2) the material terms under which the remuneration is to be paid must be disclosed in advance to the corporation's shareholders, and must be approved in advance by a majority of such shareholders in a separate shareholder vote; and (3) before the remuneration is paid, the compensation committee must certify that the performance goals and any other material terms were satisfied. *Id.*

Treasury regulations implementing Section 162(m) further explain that these performance goals must be preestablished and objective. 26 C.F.R. § 1.162-27(e)(2)(i). A performance goal satisfies the "preestablished" requirement if it is established in writing by the compensation committee not later than 90 days after the start of the period of service to which the goal relates, so long as the outcome is substantially uncertain at the time the goal is set. *Id.* Nevertheless, in no event will a performance goal be considered "preestablished" if it is set after 25% of the relevant period of service has elapsed. *Id.* And a performance goal is considered to be "objective" if a third party with knowledge of the relevant facts could determine whether the goal is met. *Id.*

These Treasury regulations further require that before any shareholder vote, the company must disclose "the employees eligible to receive compensation; a description of the business criteria on which the performance goal is based; and either the maximum amount of compensation that could be paid to any employee or the formula used to calculate the amount of compensation to be paid to the employee if the performance goal is attained[.]" *Id.* § 1.162-27(e)(4)(i). Moreover, if a compensation committee has the authority to change the targets of a performance goal in a Section 162(m) plan after shareholder approval of the goal, then the

4

material terms of the goal must be disclosed to and reapproved by the corporation's shareholders at least every five years. *Id.* § 1.162-27(e)(4)(vi).

### 3.      The Incentive Compensation Plans at Issue

At issue in this lawsuit are two incentive compensation plans in place at Caterpillar:  the Long-Term Incentive Plan (the "LTIP") and the Executive Short-Term Incentive Plan (the "ESTIP" and, together with the LTIP, the "Plans").  (D.I. 18 at ¶ 2; D.I. 22 at 5-6)

#### a.      The LTIP

The LTIP is a broad-based plan under which nearly all Caterpillar employees and Board members are eligible to participate. (D.I. 22, ex. A at 21-22) As of 2010, Caterpillar had approximately 94,000 employees. (*Id.* at 22) The LTIP is administered by the Compensation Committee (the "Committee") of the Board,[3] and its stated purpose is to provide key participants with "cash-based incentives, stock-based incentives and other equity interests in the Company, thereby giving them a stake in the growth and prosperity of the Company, aligning their interests with those of stockholders and encouraging the continuance of their services with the Company[.]" (*Id.* at 21) In the time periods referenced in the Complaint, the LTIP set a maximum amount of compensation per eligible participant in a given year of 800,000 shares of stock, or $5 million in cash. (*Id.* at 22) Caterpillar's stock price on May 2, 2012 was $102.77, which would have then equated to an award of $87,216,000 for any participant eligible to receive the maximum amount of stock allowed under the LTIP. (D.I. 18 at ¶ 52)

---

[3]      As of May 2, 2012, the Committee was composed of Defendants Goode (its Chairman), Calhoun, Rust, and Smith. (D.I. 23 at 4 n.2) As of April 1, 2013, the Committee was composed of Defendants Goode (its Chairman), Calhoun, Smith, and White. (*Id.*)

Despite being eligible to participate in the LTIP, none of the Independent Directors have actually received any performance-based incentive compensation under that Plan. Instead, in 2009, the Independent Directors began to receive an annual fixed cash retainer for their Board service. (D.I. 22, ex. A at 67) In February 2011, the Board amended the compensation for Independent Directors to include a combination of cash and equity in the form of non-performance-based, time-vested restricted stock units, set at a total fixed value of $250,000 annually. (*Id.*, ex. B at 61-62)

### b.     The ESTIP

The ESTIP is an annual incentive compensation plan covering only Caterpillar's executive officers. (D.I. 22, ex. B at 17-18) Thus, the Independent Directors are not eligible to receive compensation under the ESTIP. (*Id.*) The participants in the ESTIP may receive cash awards if they meet annual performance goals established by the Committee. (*Id.* at 17-18, 65)

### c.     The Approval and Re-approval of the Plans

#### (1)     2006 Approval of the LTIP and ESTIP

Both the LTIP and the ESTIP were established in 2006. A 2006 Proxy Statement summarized the features of both Plans, including the performance goals to be established under the Plans in light of Section 162(m). (D.I. 22, ex. D at 31, 36) Stockholders subsequently voted to approve the Plans at the 2006 Annual Meeting. (*Id.*, ex. E at 69)

#### (2)     2010 Re-approval of the LTIP

The Board sought shareholder votes on certain amendments to the LTIP at the 2010 Annual Meeting. (D.I. 22, ex. A) One such amendment was an increase in the amount of stock available for equity awards under the LTIP, from approximately 7,000,000 shares to

6

approximately 27,000,000 shares. (*Id.* at 21)  Additionally, the 2010 Proxy Statement stated that

approval of the amendments to the LTIP "will also constitute re-approval, for purposes of

Section 162(m) . . . of the performance goals included in the Plan . . . that are to be used in

connection with awards under the Plan that are intended to qualify as 'performance-based'

compensation for purposes of Section 162(m)." (*Id.*)  The Proxy Statement described the

following fourteen possible performance criteria that the Committee could use to determine

executive compensation intended to satisfy Section 162(m):

> (i) revenue; (ii) primary or fully-diluted earnings per share; (iii)
> earnings before interest, taxes, depreciation, and/or amortization;
> (iv) pretax income; (v) cash flow from operations; (vi) total cash
> flow; (vii) return on equity; (viii) return on invested capital; (ix)
> return on assets; (x) net operating profits after taxes; (xi) economic
> value added; (xii) total stockholder return; (xiii) return on sales; or
> (xiv) any individual performance objective which is measured
> solely in terms of quantifiable targets related to the Company or the
> businesses of the Company; or any combination thereof.

(*Id.* at 24)  The 2010 Proxy Statement also stated that "the Compensation Committee may elect

to provide compensation outside those requirements [for qualification as performance-based

compensation pursuant to Section 162(m)] when necessary to achieve its compensation

objectives." (*Id.* at 56)  The shareholders voted to approve the proposal to amend the LTIP (and

thus re-approve the Section 162(m) performance goals) at the 2010 Annual Meeting. (*Id.*, ex. F

at 3)

### (3)    2011 Re-approval of the ESTIP

At the 2011 Annual Meeting, the Board sought shareholder votes on approval of the

amended and restated ESTIP, including re-approval of the Plan's Section 162(m) performance

criteria.  (D.I. 22, ex. B at 17-18)  The ESTIP's performance criteria that could be used to

7

determine executive compensation included the same fourteen criteria as disclosed in 2010 for

the LTIP, as well as two additional criteria: "realized 6Sigma benefits" and "operating profit

after capital charge[.]" (*Id.* at 18)  As with the LTIP, the 2011 Proxy Statement explained that,

with regard to the ESTIP, "the Compensation Committee may elect to provide compensation

outside those requirements [for qualification as performance-based compensation pursuant to

Section 162(m)] when necessary to achieve its compensation objectives." (*Id.* at 50)

Caterpillar's shareholders voted to approve the amended and restated ESTIP, including re-

approval of the Section 162(m) performance goals, at the 2011 Annual Meeting. (*Id.*, ex. G at 2)

### 4.   **2011 and 2012 Proxy Statements at Issue**

Caterpillar provided its stockholders with the 2011 Notice of Annual Meeting and Proxy

Statement on April 29, 2011, (D.I. 22, ex. B), and it provided the 2012 Notice of Annual Meeting

and Proxy Statement on May 2, 2012, (*id.*, ex. C).  As explained above, the 2011 Proxy

Statement included a proposal to re-approve the ESTIP, which the shareholders approved at the

2011 Annual Meeting.  Additionally, both the 2011 and 2012 Proxy Statements included

proposals for shareholders to elect as directors the nominees identified therein; the shareholders

ultimately voted to elect all named nominees (which, taken together, included all current

members of the Board) at the 2011 and 2012 Annual Meetings. (*Id.*, ex. G at 1-2; *id.*, ex. H at 2)

And both the 2011 and 2012 Proxy Statements also sought shareholder approval of, on a non-

binding basis, compensation for the NEOs, which include the "covered employees" eligible for

performance-based compensation under Section 162(m).[4]  (D.I. 22, ex. B at 17, 20; *id.*, ex. C at

---

[4]        The proposals regarding NEO compensation were included pursuant to the Dodd-
Frank Wall Street Reform and Consumer Protection Act of 2010.  (D.I. 22, ex. B at 20); *see also*
15 U.S.C. § 78n-1; *Raul v. Rynd*, 929 F. Supp. 2d 333, 338 (D. Del. 2013).

8

20) In the 2011 "say-on-pay" vote, shareholders approved NEO compensation, with a vote of approximately 396.6 million in favor versus approximately 46.0 million against. (*Id.*, ex. G at 2) In the 2012 "say-on-pay" vote, shareholders again approved NEO compensation, with a vote of approximately 424.3 million in favor versus approximately 12.8 million against. (*Id.*, ex. H at 3)

In their Verified Amended Consolidated Complaint, Plaintiffs seek relief in connection with certain statements in the 2011 and 2012 Proxy Statements—statements regarding the Board's intent to structure executive compensation in light of Section 162(m). (D.I. 18 at ¶ 2) Specifically, the 2011 Proxy Statement noted that the ESTIP "is intended to comply with [S]ection 162(m)[.]" (D.I. 22, ex. B at 17) Further, the Appendix to the 2011 Proxy Statement set out the features of the ESTIP, and stated that the Plan "is a performance-based compensation plan as defined in Section 162(m) . . . and payments under the Plan are intended to qualify for tax deductibility under Section 162(m)." (*Id.* at 65; *see also* D.I. 18 at ¶ 76) The 2011 Proxy Statement also stated that:

> The goal of the Compensation Committee is to comply with the requirements of Internal Revenue Code Section 162(m), to the extent possible, with respect to long-term and short-term incentive programs to avoid losing the deduction for compensation in excess of $1 million paid to the NEOs. Caterpillar has generally structured performance-based compensation plans with the objective that amounts paid under those plans will be tax-deductible, and the plans must be approved by the Company's stockholders.

(D.I. 22, ex. B at 50; *see also* D.I. 18 at ¶¶ 41, 76)

Similarly, the 2012 Proxy Statement stated, with regard to compensation of executive officers, that:

9

> The goal of the Committee is to structure compensation to take
> advantage of th[e] exemption under Section 162(m) to the extent
> practicable. However, the Committee may elect to provide
> compensation outside those requirements when necessary to
> achieve its compensation objectives. Substantially all 2011 NEO
> compensation is expected to qualify as performance-based
> compensation under Section 162(m) or otherwise not exceed $1
> million, except [restricted stock units] granted under the
> Chairman's Award program and the CEO's base salary.

(D.I. 22, ex. C at 43; *see also* D.I. 18 at ¶¶ 42, 75)

### B.   Procedural History

On August 27, 2012, without first making a demand on the Board, Plaintiffs initiated this

shareholder derivative action on behalf of Caterpillar against the Board and the Executive

Officers. (D.I. 1) Following consolidation of this action, Plaintiffs filed a Verified Consolidated

Complaint. (D.I. 12) Defendants filed a motion to dismiss the Verified Consolidated Complaint,

pursuant to Rules 23.1 and 12(b)(6), (D.I. 16), and in response, on February 20, 2013, Plaintiffs

filed the Verified Amended Consolidated Complaint (hereinafter, the "Complaint"), (D.I. 18).

In the Complaint, Plaintiffs allege that because the LTIP and ESTIP do not actually

comply with Section 162(m), the 2011 and 2012 proxy statement disclosures regarding the tax

deductibility of the Plans (which Plaintiffs characterize as statements that the Plans "were" or

"will be" tax-deductible) were false and misleading. (*Id.* at ¶¶ 2, 77) Plaintiffs allege three

causes of action in the Complaint related to those allegations: (1) breach of fiduciary duty, (*id.* at

¶¶ 90-96); (2) waste of corporate assets, (*id.* at ¶¶ 97-102); and (3) unjust enrichment, (*id.* at ¶¶

103-106).

In lieu of filing an Answer, on April 15, 2013, Defendants filed the instant Motion. (D.I.

21) Defendants' Motion was fully briefed as of June 21, 2013. (D.I. 25) On July 11, 2013, this

matter was referred to the Court by Judge Leonard P. Stark to hear and resolve all pre-trial

matters, up to and including the resolution of case-dispositive motions. (D.I. 29)  Thereafter,

both sets of parties submitted notices apprising the Court of supplemental authority and/or facts

assertedly relevant to the Motion. (D.I. 32, 33)  All parties requested oral argument on the

Motion, (D.I. 27, 28), and at the parties' request, the date for oral argument was postponed until

April 30, 2014, (D.I. 36 (hereinafter, Tr.")).  After oral argument was held on that date, the

parties submitted supplemental letter briefs on May 6, 2014. (D.I. 34, 35)  The Motion is now

ripe for decision.

## II.   LEGAL STANDARD

Generally, a corporation's board of directors is tasked with the decision of whether to

initiate or pursue a lawsuit on behalf of the corporation. Del. Code tit. 8, § 141; *see also In re

Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009).[5]  This

responsibility flows from the "'cardinal precept'" of Delaware law that "'directors, rather than

shareholders, manage the business and affairs of the corporation.'" *In re Citigroup*, 964 A.2d at

120 (quoting *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).

Pursuant to Rule 23.1, in order to maintain a derivative action on behalf of a corporation

in federal court, a shareholder plaintiff's complaint must, *inter alia*, "state with particularity":

"(A) any effort by the plaintiff to obtain the desired action from the directors or comparable

authority and, if necessary, from the shareholders or members; and (B) the reasons for not

obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3); *Raul v. Rynd*, 929 F.

---

[5]     It is undisputed that because Caterpillar is a Delaware corporation, Delaware law
governs the analysis of whether demand is excused. (D.I. 22 at 12 & n.4; D.I. 23 at 12)

Supp. 2d 333, 340 (D. Del. 2013). In this way, Rule 23.1 reflects a requirement for "a shareholder plaintiff [to] make a pre-suit demand on the board of directors prior to filing a derivative suit on behalf of the company, or to provide a satisfactory explanation for why the plaintiff has not done so." *Raul*, 929 F. Supp. 2d at 340. The "demand requirement allows the corporate machinery to self-correct problems and to safeguard against frivolous lawsuits." *Id.*; *see also Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007).

While Rule 23.1 sets out the pleading standard for derivative actions in federal court, including the specificity of pleading required as to pre-suit demand, the substantive requirements of demand are ultimately a matter of state law. *King v. Baldino*, 409 F. App'x 535, 537 (3d Cir. 2010). In that regard, Delaware state law instructs that when making a demand on the board of directors would clearly be futile, the demand requirement may be excused. *See Aronson*, 473 A.2d at 814-15, *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In analyzing whether demand would have been futile, a court must determine whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested or independent; or (2) the challenged transaction was the product of a valid exercise of business judgment. *Id.* at 814; *see also Levine v. Smith*, 591 A.2d 194, 205 (Del. 1991) (stating that demand futility can be shown under the first *Aronson* prong if there is sufficient suggestion that directors are either interested or lack independence), *overruled on other grounds by Brehm*, 746 A.2d 244; *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 820 (Del. Ch. 2005) (explaining that demand is excused if either prong of the *Aronson* test is satisfied). Demand futility must be determined on a claim-by-claim basis; the fact that demand is futile as to one claim does not automatically render it futile as to the others. *MCG Capital Corp. v. Maginn*,

12

Civil Action No. 4521-CC, 2010 WL 1782271, at *18 (Del. Ch. May 5, 2010). Alleging that demand is excused is a "difficult feat[.]" *Ryan*, 918 A.2d at 352 n.23; *see also Richelson v. Yost*, 738 F. Supp. 2d 589, 597 (E.D. Pa. 2010) (citing *Ryan* and explaining that demand futility "is a very onerous standard for a plaintiff to meet").

At the motion to dismiss stage, the court considers the well-pleaded allegations of the complaint, the documents incorporated into the complaint by reference and judicially-noticed facts, drawing all reasonable inferences from the complaint's allegations in favor of the plaintiff. *See N.J. Bldg. Laborers Pension Fund v. Ball*, Civil Action No. 11-1153-LPS-SRF, 2014 WL 1018210, at *5 (D. Del. Mar. 13, 2014); *Raul*, 929 F. Supp. 2d at 341. However, a court is not obligated to accept as true bald assertions, unsupported conclusions and unwarranted inferences, or allegations that are self-evidently false. *Raul*, 929 F. Supp. 2d at 341.

## III. DISCUSSION

In this case, Plaintiffs claim that demand would have been futile under both prongs of the *Aronson* test. (D.I. 23 at 12) Thus, the threshold issue presented by Defendants' Motion is whether the particularized factual allegations of the Complaint create either a reasonable doubt that a majority of Caterpillar's Board were disinterested or independent, or a reasonable doubt that the challenged transactions were the products of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814. For the reasons that follow, the Court agrees with Defendants that Plaintiffs have failed to plead particularized facts sufficient to show that demand is excused under either *Aronson* prong. (D.I. 22 at 12-22; D.I. 25 at 3-12)

### A. Director Interest

#### 1. Standard of Review

Under *Aronson*'s first prong, the Court must review the factual allegations of Plaintiffs'

Complaint to determine whether they create a reasonable doubt as to the distinerestedness of the

Director Defendants as of the time the Complaint was filed.[6] *Blasband v. Rales*, 971 F.2d 1034,

1048 (3d Cir. 1992). "Directorial interest exists whenever divided loyalties are present, or where

the director stands to receive a personal financial benefit from the transaction not equally shared

by the shareholders." *Id.* (citing Delaware state case law); *see also Aronson*, 473 A.2d at 812

(explaining that disinterested directors can "neither appear on both sides of a transaction nor

expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a

benefit which devolves upon the corporation or all stockholders generally"). "Generally, the

interest at issue must be material to the director, and materiality is assessed based upon the

individual director's economic circumstances." *Freedman v. Adams*, C.A. No. 4199-VCN, 2012

WL 1345638, at \*6 (Del. Ch. Mar. 30, 2012), *aff'd*, 58 A.3d 414 (Del. 2013). In analyzing

whether a director is "interested" for demand purposes, courts examine the specific transaction(s)

being challenged. *See Abrams v. Wainscott*, Civil Action No. [1]1-297-RGA, 2012 WL

3614638, at \*2 (D. Del. Aug. 21, 2012) ("The demand futility analysis proceeds transaction-by-

transaction.") (citing *Khanna v. McMinn*, No. Civ.A. 20545-NC, 2006 WL 1388744, at \*14 (Del.

Ch. May 9, 2006)); *Seinfeld v. Slager*, Civil Action No. 6462-VCG, 2012 WL 2501105, at \*3

(Del. Ch. June 29, 2012) (explaining that to determine demand futility, the court must analyze

each of the challenged transactions individually). In order for demand to be futile under the first

*Aronson* prong, a majority of board members, or one-half of an evenly-numbered board, must be

---

[6]     Plaintiffs do not raise an argument that a majority of the Director Defendants were
not independent for purposes of *Aronson*'s first prong.

14

interested. *See Beam v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004).

### 2. Director Interest in Payment of Certain Executive Compensation Via the ESTIP and LTIP, Referenced in the 2011 and 2012 Proxy Statements

Here, it is undisputed that Plaintiffs' claims are focused on certain transactions: the

payment of certain executive compensation to "covered employees" referred to in the 2011 and

2012 Proxy Statements, respectively. (D.I. 25 at 4; Tr. at 49-50; *see also* D.I. 18 at ¶¶ 2, 40-42,

73-83, 90-106) Thus, in considering the first prong of *Aronson*, the Court must analyze whether

the directors were sufficiently interested in these transactions. (Tr. at 50)[7]

It is also clear that the gravamen of the Complaint is the purportedly false and misleading

nature of the Section 162(m)-related statements which relate to the payment of the executive

compensation referred to above. (D.I. 18 at ¶ 2) And since the challenged content in the two

Proxy Statements relates, in one way or another, to the subject of executive compensation, it

makes sense to (as both sets of parties do in their briefing) analyze the question of director

interest through the prism of the two Plans at issue in the Complaint through which executives

could be compensated: the ESTIP and the LTIP.

### a. ESTIP

---

[7]     In paragraph 99 of the Complaint (in Count II, the waste claim), it is alleged that the "Director Defendants approved the Plans and the amendments to the Plans, which provides for maximum payments in amounts so excessive, that no officer or director of ordinary sound business judgment would award them so as to constitute waste." (D.I. 18 at ¶ 99) That kind of allegation could be said to implicate a "transaction" other than those referred to above (such as the re-approval of the LTIP in 2010 by the Company's shareholders). However, at oral argument, Plaintiffs' counsel confirmed that the challenged transactions at issue did not include, *inter alia*, the 2010 re-approval of the LTIP. (Tr. at 50) And that confirmation is in line with the content of the remaining allegations in Counts I, II, and III—all of which appear to be focused on the payment of executive compensation to "covered employees" in 2011 and 2012 and disclosures about the tax deductibility of that compensation.

First, as to whether the Complaint alleges sufficient facts to demonstrate director interest in certain compensation paid through the ESTIP, Defendants note that the Complaint contains no allegations that the Independent Directors were "interested" in the ESTIP. (D.I. 22 at 15) This is so, Defendants assert, because the Independent Directors are not eligible to participate in the ESTIP, and thus "there can be no plausible basis for arguing that they are interested in the ESTIP or the 2011 shareholder vote reapproving it." (*Id.*)

It is undisputed that the ESTIP does not cover the Independent Directors. (Tr. at 57) Plaintiffs' answering brief did not address this line of argument; instead, the section of their brief devoted to demand focuses exclusively on the Director Defendants' financial interest in payments made pursuant to the LTIP. (D.I. 23 at 12-16) And at oral argument, Plaintiffs' counsel conceded that the Independent Directors could not have had a financial interest in payment of any type of compensation via the ESTIP. (Tr. at 59) Thus, it is clear that demand is not excused (at least under the first prong of *Aronson*) with respect to any challenged transactions or portions of the Proxy Statements that in some way relate to the ESTIP.

### b.    LTIP

Second, as to director interest in certain compensation paid via the LTIP, Defendants assert in their briefing that an overwhelming majority of the Director Defendants are disinterested in the challenged transactions, because any compensation the Independent Directors could receive under the LTIP is not subject to the requirements of Section 162(m), which applies only to "covered employees." (D.I. 22 at 16) In response, Plaintiffs contend that "since every director is eligible to participate in the LTIP, they are all interested." (D.I. 23 at 13; *see also id* (explaining that "the directors are interested in the approval of the LTIP so that they can receive

16

payments pursuant to it"))

More specifically, in articulating this argument, Plaintiffs focus on the most recent shareholder re-approval of the amendments to the LTIP; they note that due to that vote, shareholders increased the amount of shares issuable under the Plan (from 7 million to 27 million shares). (*Id.* at 15-16) According to Plaintiffs, it was in the Board's interest to obtain this type of shareholder approval, because without it, and with "each participant [in the LTIP] eligible to receive 800,000 shares of stock awards per year . . . and . . . approximately 94,000 participants to the LTIP, [the prior limit of] 7,000,000 [shares would have been] obviously insufficient to provide compensation for all eligible participants [including the Board members]." (*Id.*)

However, although Plaintiffs highlight the Directors' purported interest in re-approval of the LTIP and increasing this share amount, that vote occurred in 2010, not in 2011 or 2012. Thus, the vote was not a part of the particular transactions that are at issue in the Complaint—the payment of certain executive compensation referenced in the 2011 and 2012 Proxy Statements—and is thus irrelevant to whether the Directors were interested in the *challenged transactions*. (*See* Tr. at 59 (Plaintiffs' counsel acknowledging same))

After that line of argument is set to the side, Plaintiffs are left with the assertion that since the Directors could possibly receive payments pursuant to the LTIP, they are necessarily interested in any transaction relating to the LTIP, including the payment of compensation to the "covered employees" (and whether that compensation is tax-deductible pursuant to Section 162(m)). Yet the recent case law in this area does not support such a sweeping interpretation of director interest. That is, the case authority does not suggest that a defendant director's eligibility to participate in a compensation plan alone excuses demand, regardless of whether the

17

challenged *portion of the plan at issue* actually has some application to the director. In addressing the viability of Plaintiffs' argument in this regard, both parties cite to the decision in *Seinfeld v. Slager*, Civil Action No. 6462-VCG, 2012 WL 2501105, at \*3 (Del. Ch. June 29, 2012) and assert that the case supports their respective positions, (D.I. 22 at 17; D.I. 23 at 14-15). But in *Slager*, the Delaware Court of Chancery rejected a similar argument to that Plaintiffs put forward here.

In *Slager*, the plaintiff initiated a derivative lawsuit stating various claims in relation to, *inter alia*, compensation paid under a company's stock plan, which covered employees, officers, and directors. *Slager*, 2012 WL 2501105, at \*1, \*10. One of the plaintiff's claims pertained to the board of directors' award of time-vesting stock options to employees. *Id.* at \*12. The plaintiff asserted that the director defendants had breached their duties by granting only non-tax-deductible time-vesting options to company employees under the stock plan. *Id.* And, in explaining why demand was futile as to the transaction, the plaintiff asserted that the directors were interested "not because they received any direct benefit from awarding the time-vesting stock options to non-director employees, but because they themselves were general participants in the [s]tock [p]lan" and because they had in the past "award[ed] themselves as directors . . . time-based stock units from [the plan]." *Id.* at \*13-14 (internal quotation marks and citations omitted). The *Slager* Court disagreed. *Id.* Instead, it found that:

> In regard to awards to employees, the [p]laintiff is not challenging the [s]tock [p]lan as a whole and does not allege that the [s]tock [p]lan itself is inherently wasteful; instead, he is challenging awards to employees, not to the directors themselves. The [p]laintiff's claim stems from the Board's choice to award one particular type of option to those non-director employees. The [d]efendant [d]irectors, therefore, with respect to employee awards, are not

18

interested in the challenged *transactions*.

*Id.* at *14 (emphasis in original).[8]

This Court has followed *Slager*'s interpretation of director interest in transactions arising

out of compensation plans under which directors are general participants. *See, e.g.*, *Ball*, 2014

WL 1018210, at *4-5 (holding that director defendants were not interested in challenged

transactions for purposes of demand futility, despite their eligibility to participate generally in a

stock plan at issue, where "the causes of action set forth in the complaint are based entirely on

executive compensation under the [] [p]lan and the alleged non-tax-deductibility of those

executive compensation awards[,]" and the directors had no financial interest in those awards to

executives) (citing *Slager*, 2012 WL 2501105, at *14); *Freedman v. Mulva*, Civil Action No. 11-

686-LPS-SRF, 2014 WL 975308, at *3 (D. Del. Mar. 12, 2014) (same).[9] And just as was the

---

[8]     In contrast, the *Slager* Court found the company's directors to be interested with
respect to another of the plaintiff's claims, relating to excessive compensation that the defendant
directors paid to themselves via the stock plan. *Id.* at *1, *11-12. This is the portion of the
opinion that Plaintiffs cite to in arguing that *Slager* "actually supports Plaintiffs' allegation that
all the directors are interested." (D.I. 23 at 14-15) However, Plaintiffs fail to explain that this
finding of director interest by the *Slager* Court was specific to a claim relating to "the amounts
awarded by the [d]efendant [d]irectors *to themselves*[.]" *Slager*, 2012 WL 2501105, at *14 n.132
(emphasis added). Clearly, then, the *Slager* Court came to opposite conclusions regarding
director interest with respect to two claims stemming from awards made under the same stock
plan, and the respective decisions hinged on whether the challenged transaction specifically
applied to the directors.

[9]     Plaintiffs cite to two decisions from this Court, *Resnik v. Woertz*, 774 F. Supp. 2d
614 (D. Del. 2011) and *Hoch v. Alexander*, Civil Action No. 11-217, 2011 WL 2633722 (D. Del.
July 1, 2011), as supporting their position that "eligibility to participate in a compensation plan
without a meaningful maximum or limit excuses demand"—regardless of whether the directors
are affected by the particular plan provision that has actually been challenged in the claims of the
relevant complaint. (D.I. 23 at 15) Even if *Resnik* and *Hoch* can be interpreted to support
Plaintiffs' argument in this regard, it is important to note that these decisions were issued before
the decision in *Slager*. As noted above, *Slager*'s holding is clearly in conflict with Plaintiffs'
argument here. And since state law provides the substantive rules for determining whether a

19

case with those decisions (and in *Slager*), the Complaint here cannot fairly be read to challenge the LTIP as a whole. Rather, its causes of action are focused on the tax deductibility of compensation paid *to Caterpillar's top executives* pursuant to the LTIP and ESTIP, and on the allegedly false and misleading statements made in the Proxy Statements as to that subject.[10]  (D.I. 18 at ¶¶ 90-106) The Independent Directors have no identifiable financial interest in that type of executive compensation, in the tax deductibility of that compensation pursuant to Section 162(m), nor any other aspect of the Proxy Statements that might relate to the LTIP. Accordingly, although they are eligible to participate in the LTIP generally, a majority of the Directors are not financially interested in the specific aspects or provisions of that Plan that are being challenged here. *See Ball*, 2014 WL 1018210, at *5; *Mulva*, 2014 WL 975308, at *3; *Slager*, 2012 WL 2501105, at *14.

---

plaintiff has satisfied the demand futility standard, post-*Slager*, Plaintiffs' argument is clearly unavailing. *Warhanek v. Bidzos*, Civil Action No. 12-263-RGA-SRF, 2013 WL 5273112, at *8 n.6 (D. Del. Sept. 18, 2013).

[10]     During oral argument, Plaintiffs' counsel attempted to distinguish their director interest argument from the holding of *Slager* by arguing that here, the Complaint *is* "challenging the [LTIP] as a whole[.]" (Tr. at 52-53) If correct, this would presumably make it easier for the Court to find that the Independent Directors have an interest in the challenged transactions, since the LTIP "as a whole" could theoretically benefit them in some way. (*Id.*) However, it is very clear that the provisions of the LTIP relating to compensation paid to "covered employees"—those that Caterpillar represents are intended to comply with Section 162(m)—are the *sine qua non* of Plaintiffs' Complaint. (D.I. 18; *see also, e.g.*, D.I. 23 at 19 ("The Amended Complaint at bar alleges that the Director Defendants breached their fiduciary duties by making false or misleading representations in the 2011 and 2012 Proxy Statements that the Company's LTIP . . . provided tax-deductible compensation to the Covered Employees.")) Plaintiffs simply do not raise claims relating to other aspects of the (very broad-ranging) LTIP. At oral argument, when asked how the allegations in Counts I, II and III could be said to relate to anything other than to the tax treatment of compensation paid to the "covered employees," Plaintiffs' counsel asserted only that "*to the extent* [the Complaint] alleges that the compensation payable to directors is too high, it certainly alleges problems with the directors." (Tr. at 55 (emphasis added)) The Complaint, however, contains no such allegations. (*See* D.I. 18)

### 3.    Director Interest in Director Re-elections

At oral argument, Plaintiffs did not focus (as they had in their briefing) on the Director

Defendants' eligibility to participate under the LTIP as the reason why the Directors were

interested in the challenged transactions. Instead, Plaintiffs put forward an entirely new

argument. (*See* Tr. at 60 (Plaintiffs' counsel acknowledging that their position at oral argument

was "expand[ing] upon" the arguments put forward in Plaintiffs' briefing); *id.* at 68 (Defendants'

counsel pointing out that this is a "new argument")) That is, Plaintiffs now contend that the

Director Defendants are interested in the relevant transactions because they were up for

reelection in 2011 and 2012, and because they made the challenged statements regarding tax

deductibility of executive compensation in the very same Proxy Statements in which they were

soliciting shareholder votes for their own Board positions. (Tr. at 48, 55-57, 59-60)[11] Plaintiffs'

new argument, taken to its extreme, would mean that whenever a proxy statement seeks the

election of directors, those directors are effectively interested in—for purposes of demand

futility—*any* challenged transaction described in or relating to that proxy statement. Plaintiffs

cite no legal authority—and the Court is aware of none—in support of this exceedingly broad

proposition.[12]

---

[11]    That this is a new argument is underscored by the "Demand Allegations" set out in Plaintiffs' Complaint with respect to director interest, which simply do not assert that the Directors had an "interest" in the relevant transactions because those transactions in some way related to the Directors' own re-election. Rather, Plaintiffs alleged in their Complaint that "[a]ll of the members of the Board are eligible to participate in the LTIP and are thus interested under Delaware law. Their interest lies in the fact that each director is entitled to receive a personal financial benefit that is not equally shared by the stockholders, and seeking stockholder votes for approval of the amendment of the LTIP constituted a self-dealing transaction." (D.I. 18 at ¶ 86)

[12]    It is true that "[a] plaintiff-shareholder may successfully plead pre-suit demand futility by alleging that the sole or primary purpose of the challenged board action was to

21

### 4.   Conclusion

In light of the above, Defendants' position as to director interest must prevail here. As

Plaintiffs have failed to plead that a majority of the Director Defendants have a disabling

personal interest that would excuse the demand requirement under the first prong of *Aronson*, the

Court turns next to the second *Aronson* prong.

### B.   Business Judgment Rule

#### 1.   Disclosure Claim

##### a.   Demand is Not Automatically Excused

As to the second prong of the *Aronson* test, Plaintiffs' primary argument is that disclosure

claims like that in Count I are not protected by the business judgment rule as a matter of law,

because such claims do not relate to conduct that concerns management of business. (D.I. 23 at

16-18) For their part, Defendants contend that "[a]n overwhelming majority of courts . . . have

consistently rejected the argument that demand is *per se* excused in cases alleging that directors

breached a duty of disclosure." (D.I. 22 at 19-20 (citing cases); *see also* D.I. 25 at 10)

---

perpetuate the directors in control of the corporation." *Greenwald v. Batterson*, No. 16475, 1999
WL 596276, at *5 (Del. Ch. July 26, 1999) (internal quotation marks and citation omitted). A
mere allegation that directors have taken action to entrench themselves, however, "without an
allegation that the directors believed themselves vulnerable to removal from office, will not
excuse demand." *Id.* "A successful claim of demand futility requires an allegation that an actual
threat to the directors' positions on the board existed." *Id.* Plaintiffs' Complaint here is
completely devoid of any such allegations; therefore, even were it being put forward here, this
theory of demand futility would fail. *See In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d
317, 323 (S.D.N.Y. 2008) (rejecting argument that defendants were interested in challenged
transaction because of their desire to perpetuate their control of corporation, where relevant
proxy statement was issued in connection with the reelection of four unopposed board members,
in the absence of "particularized allegations demonstrating that the board members' prospects of
remaining in office were ever in serious doubt, or would have been in serious doubt if [certain
information] had been revealed to shareholders" pursuant to that proxy statement) (citing
Delaware state case law).

The Court is convinced that the law supports Defendants' position.  While the parties could not point the Court to a Delaware state court decision that contains an affirmative and firm holding as to this issue, (Tr. at 35, 64), the decision in *Freedman v. Adams*, C.A. No. 4199-VCN, 2012 WL 1345638, at *16 n.155 (Del. Ch. Mar. 30, 2012), strongly suggests that demand is not automatically excused in derivative actions alleging disclosure violations.  The plaintiff in *Freedman*, who had brought a derivative action, presented the same theory as Plaintiffs do here as to why demand was so excused, and (as Plaintiffs do here) she primarily relied in support on *In re Tri-Star Pictures, Inc. Litig.*, CIV. A. No. 9477, 1990 WL 82734, at *8 (Del. Ch. June 14, 1990). *Freedman*, 2012 WL 1345638, at *16 & n.155; *see also* (D.I. 23 at 17 (Plaintiffs citing *Tri-Star* for the proposition that "Delaware has established that proxy disclosure violations do not require demand because the 'demand requirement . . . is rooted in business judgment rule considerations . . . [and] Delaware case law hold[s] that the business judgment rule does not apply' to disclosure claims") (internal citation omitted)).  The *Freedman* Court, however, pointed out that *Tri-Star* "actually held that [the demand requirement] was not applicable to the disclosure claims at issue because those claims were direct class claims" rather than derivative claims. *Freedman*, 2012 WL 1345638, at *16 n.155; *see also id.* at n.154.  Although the *Freedman* Court did not ultimately need to decide the issue, it noted that the plaintiff "appears to conflate the fact that disclosure claims are generally *not subject to* the demand requirement (because they are usually direct claims) with the idea that a properly pled disclosure claim *excuses* demand under *Aronson*'s second prong." *Id.* at *16 n.155 (emphasis in original).  Thus, the language used by the *Freedman* Court tends to undercut the primary legal underpinning of Plaintiffs' argument here.

If the wording of *Freedman* weakens Plaintiffs' argument, then the well-reasoned decisions in many other cases flatly reject it. (*See* D.I. 22 at 19-20 (citing cases))  An exemplary decision is *Bader v. Blankfein*, No. 07-CV-1130 (SLT)(JMA), 2008 WL 5274442 (E.D.N.Y. Dec. 19, 2008), in which the United States District Court for the Eastern District of New York explained that while it may be correct that "the decision of whether to include information in a proxy statement does not require an exercise of business judgment . . . directors must still use their business judgment in deciding what course of action to take when alerted to a materially false statement in a corporate proxy statement." *Bader*, 2008 WL 5274442, at *6 (interpreting Delaware state law).  In concluding that proxy disclosure violations are not exempt from the demand requirement, the *Bader* Court further reasoned that "[i]f shareholders could elect to sue on behalf of a corporation without consulting the board of directors whenever they deemed a proxy statement to contain materially false information, shareholders could effectively usurp the board's decision as to whether litigation was merited." *Id.*  Indeed, this Court has repeatedly reached the same conclusion—that "[u]nder Delaware law, derivative claims based on a proxy statement nondisclosure are not excused from the demand requirement under *Aronson*'s second prong." *Ball*, 2014 WL 1018210, at *6; *see also Mulva*, 2014 WL 975308, at *4; *Abrams*, 2013 WL 6021953, at *3-4.

In light of the persuasive authority supporting Defendants' position, the Court is convinced that the demand requirements apply to derivative disclosure claims.

### b.   Claims are Brought as Derivative (Not Direct) in Nature

Plaintiffs also take another tack in asserting why demand is not required as to the disclosure claim in Count I.  In a footnote in their briefing, they write, "[a]lternatively, disclosure

24

claims such as the ones at bar are arguably direct in nature, and therefore, warrant[] a more []

lenient Fed. R. Civ. P. 12(b)(6) review." (D.I. 23 at 16 n.4 (citing *Freedman*, 2012 WL 1345638,

at 16 n.155)) Plaintiffs made a similar claim in a supplemental letter brief filed after oral

argument. (D.I. 35)

It is worth noting, as an initial matter, that Plaintiffs clearly styled their claims as

derivative claims, (D.I. 18 at ¶ 1), and that their counsel confirmed at oral argument that

Plaintiffs "think [their claims are] derivative[,]" (Tr. at 65). Nonetheless, regardless of how

Plaintiffs labeled their claim, or how they conceive of it, in determining whether a claim is

derivative or direct, courts must look to the nature of the wrong alleged in the body of the

complaint. *Protas v. Cavanagh*, Civil Action No. 6555-VCG, 2012 WL 1580969, at *5 (Del.

Ch. May 4, 2012). Whether a claim is derivative or direct depends on the results of two

inquiries: "(1) who suffered the alleged harm (the corporation or the suing stockholders,

individually); and (2) who would receive the benefit of any recovery or other remedy (the

corporation or the stockholders, individually)[.]" *Id.* (quoting *Tooley v. Donaldson, Lufkin, &

Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)). To maintain a direct claim, a shareholder

"must demonstrate that 'considering the nature of the wrong alleged and the relief requested . . .

he or she can prevail without showing an injury to the corporation.'" *In re Tyson Foods, Inc.*,

919 A.2d 563, 601 (Del. Ch. 2007) (quoting *Tooley*, 845 A.2d at 1036).

Here, the Court finds that Plaintiffs' disclosure claim is pleaded as a derivative claim.

The Chancery Court has held that "[w]here a shareholder has been denied one of the most critical

rights he or she possesses—the right to a fully informed vote—the harm suffered is almost

always an individual, not corporate, harm." *In re Tyson*, 919 A.2d at 601. Here, Plaintiffs'

disclosure claim does reference certain shareholder votes relating to director elections and re-approval of the ESTIP. (D.I. 18 at ¶ 91) However, Plaintiffs clearly allege that *the corporation*—and not the shareholders, individually—has been injured as a result of the asserted wrongs at issue. Specifically, Plaintiffs allege that the Director Defendants' acts in distributing the assertedly false and misleading Proxy Statements "*have injured the Company* by interfering with proper corporate governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors and for the amendment and restatement of the ESTIP" and "*injured the Company* by misrepresenting the tax deductibility of the LTIP." (*Id.* at ¶¶ 91, 92 (emphasis added); *see also id.* at ¶ 98) Plaintiffs therefore charge that "[a]s a result of these actions of the Director Defendants, *the Company has been and will be damaged.*" (*Id.* at ¶ 94 (emphasis added); *see also id.* at ¶¶ 100, 105) Thus, in asserting that harm related to the claim in Count I impacted the Company—and in not alleging a special injury to the shareholders—Plaintiffs allege a disclosure claim that is derivative in nature. *See Thornton v. Bernard Techs., Inc.*, C.A. No. 962-VCN, 2009 WL 426179, at *3 & n.28 (Del. Ch. Feb. 20, 2009) (concluding that disclosure claims were derivative (and not direct) in nature where plaintiffs asserted "that bad things happened to [the corporation] (i.e., financial disaster) because [the shareholders] were induced into voting for allegedly inept directors" and sought to recover for losses suffered by the corporation).[13]

---

[13]     The Court notes that Plaintiffs' supplemental letter brief appears to assert that their Complaint raises a direct claim under Section 14(a) of the Securities Exchange Act of 1934. (D.I. 35 at 1-2) A claim for violations of Section 14(a) may be brought as either a direct or derivative claim. *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964), *abrogated on other grounds by Touche Ross & Co. v. Redington*, 442 U.S. 560, 577-78 (1979); *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 864 n.13 (S.D. Ohio 2013). At oral argument, however, Plaintiffs' counsel confirmed that Plaintiffs were *not* raising any claims under Section 14(a). (Tr. at 118)

For these reasons, the Court finds that Plaintiffs' disclosure claim has been brought as a derivative claim.

### c.   Plaintiffs' Allegations Relevant to Second *Aronson* Prong

Having established that Plaintiffs' disclosure claim in Count I is a derivative claim and one subject to the business judgment rule, the Court turns to an analysis of *Aronson*'s second prong.

Plaintiffs, in their briefing, did not attempt to persuade the Court that they pleaded with particularity facts meeting this prong's requirements.[14] Nevertheless, the Court will consider Plaintiffs' allegations in this vein, as Plaintiffs' counsel asserted at oral argument that their allegations are "sufficient [] . . . for [*Aronson*'s] second prong in that [the Complaint] alleges that there is a misdisclosure in the proxy statements concerning the tax deductibility of the [P]lan." (Tr. at 61)

If the first prong of *Aronson* is not satisfied, a presumption arises that the board's actions were the product of a valid exercise of business judgment. *Blasband*, 971 F.2d at 1049; *Mulva*, 2014 WL 975308, at *3 (citing *Beam*, 845 A.2d at 1049). To satisfy the second *Aronson* prong, a plaintiff must plead sufficiently particularized facts to "'raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision.'" *In re J.P. Morgan Chase*, 906 A.2d at 824 (quoting *In re*

---

Indeed, their Complaint is consistent with that representation, as it never mentions the statute, and does not allege that Defendants' acts injured Plaintiffs directly. (D.I. 18); *see also Resnik*, 774 F. Supp. 2d at 632 (holding plaintiff's direct claim under Section 14(a) failed because complaint did not allege an actual economic injury to plaintiff)).

[14]   Instead, Plaintiffs focused exclusively on their argument that they were not required to comply with demand requirements as to this type of claim. (D.I. 23 at 16-18)

*Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003)). To determine whether this standard has been met for disclosure claims, courts look to whether the complaint sufficiently alleges (1) a misstatement or omission that constitutes a disclosure violation; and, if so, (2) that the director defendants had knowledge that such disclosures were false or misleading, or that the directors acted in bad faith in not adequately informing themselves of that fact. *Cf. Ball*, 2014 WL 1018210, at *6; *In re Dow Chem. Co. Derivative Litig.*, Civil Action No. 4349-CC, 2010 WL 66769, at *10 (Del. Ch. Jan. 11, 2010); *see also Bader v. Anderson*, 179 Cal. App. 4th 775, 798 (Cal. Ct. App. 2009). The second *Aronson* prong is satisfied only in "an extreme case of directorial failure"—that is, "[t]he situation must be one of the 'rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability exists.'" *Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, Civil Action No. 3443-VCP, 2009 WL 353746, at *7 n.50 (Del. Ch. Feb. 12, 2009) (quoting *Aronson*, 473 A.2d at 815).

Here, Plaintiffs fail to allege with particularity any misstatement or omission in the 2011 and 2012 Proxy Statements that would constitute a disclosure violation. Instead, when Plaintiffs' Complaint alleges that the Proxy Statements were "materially false[,]" it does so by stating that the Proxy Statements represented that the LTIP and ESTIP *"complied with* [Section] 162(m) and that the compensation paid to the Covered Employees *was or will be tax-deductible*." (D.I. 18 at ¶ 77 (emphasis added); *see also id.* at ¶ 2) But a review of the challenged text of the Proxy Statements demonstrates that Plaintiffs' core allegation is actually incorrect. In actuality, the Proxy Statements asserted only that the compensation awards were *intended* to comply with Section 162(m), or that it was the Company's *objective* that such awards would be tax-

28

deductible, or that substantially all such compensation was *expected* to be tax-deductible. (D.I. 22, ex. B at 17, 50, 65; *id.*, ex. C at 43)[15] Put another way, the Complaint alleges that what is "materially false" about the 2011 or 2012 Proxy Statements are their inclusion of certain statements of fact—statements that, in reality, simply are not contained in the actual text of the relevant Proxy Statements. To the contrary, the Proxy Statements never flatly stated that the executive compensation at issue would, in fact, be tax deductible under Section 162(m).

Thus, because the Proxy Statements at issue (which the Court can take into account here) clearly do not include language stating that the Plans "complied with" Section 162(m) or "was or will be tax deductible[,]" Plaintiffs have not adequately pleaded a misstatement that constitutes a disclosure violation, for purposes of the second *Aronson* prong. *Cf. Warhanek v. Bidzos*, Civil Action No. 12-263-RGA-SRF, 2013 WL 5273112, at *5, *9 (D. Del. Sept. 18, 2013) (finding that plaintiff failed to allege a misstatement or omission in relevant proxy statement where the allegations were that the proxy statement "promised" tax deductions under Section 162(m), but in reality, the actual proxy statement expressly stated that all or portion of awarded compensation may not be deductible); *Seinfeld v. O'Connor*, 774 F. Supp. 2d 660, 666 (D. Del. 2011)

---

[15]        There is one assertion in the 2011 Proxy Statement that might, at first glance, appear to amount to a statement that compensation paid under the ESTIP was tax deductible. (D.I. 18 at ¶ 76; D.I. 23 at 22)  It is found in the text of the ESTIP, attached as an appendix to the 2011 Proxy Statement: *"The Plan is a performance-based compensation plan* as defined in Section 162(m) of the Internal Revenue Service of 1986[.]" (D.I. 22, ex. B at 65 (emphasis added))  However, as Defendants point out, that statement amounts to merely one portion of a sentence, and it must be read in context with the remainder of that sentence. (D.I. 22 at 24 n.10; Tr. at 83)  The rest of the sentence states: "and payments under the Plan *are intended to* qualify for tax deductibility under Section 162(m)." (D.I. 22, ex. B at 65 (emphasis added))  Thus, taken as a whole, this statement cannot be fairly read to assert that compensation paid to the "covered employees" pursuant to the ESTIP was, in fact, Section 162(m)-compliant, or would be tax-deductible.

(concluding that proxy statement did not "say what [plaintiff] alleges" and did not contain false or misleading statements, where statement did not assert that plan would be tax-deductible, but only that it was "intended" to be deductible under Section 162(m), and thus contained "no promise that [the plan] was guaranteed to be tax-deductible").

However, even were Plaintiffs' Complaint to have adequately and accurately alleged the requisite misstatement or omission, Plaintiffs could not have satisfied *Aronson*'s second prong, because they made no attempt to plead that any of the alleged disclosure violations were made knowingly or in bad faith. (*See* D.I. 18)  Determining that Defendants had knowledge of the statements' falsity or exhibited bad faith "requires an analysis of the state of mind of the individual director defendants." *In re Dow Chem. Co.*, 2010 WL 66769, at *10 (internal quotation marks and citation omitted).  Here—in the absence of any facts pleaded in the Complaint regarding the involvement of the Directors in the preparation of the challenged language at issue, or that would otherwise establish that the Directors knew that the language was false and misleading or acted in bad faith in failing to inform themselves of the same—the Court cannot conclude that the Complaint's allegations meet *Aronson*'s requirements for sufficient particularity. *See id.* at *10-11; *see also Ball*, 2014 WL 1018210, at *6 (holding that plaintiff's disclosure claims failed to satisfy the demand requirement under *Aronson*'s second prong where "nothing in [plaintiff's] complaint suggests that the [d]irector [d]efendants were aware of the alleged misstatements or omissions, intended to cause harm to [the corporation] by incurring unnecessary tax liabilities, or acted in bad faith by not adequately informing themselves");

*Mulva*, 2014 WL 975308, at \*4 (same).[16]

## 2.    Waste and Unjust Enrichment Claims

Plaintiffs also allege claims of waste and unjust enrichment (Counts II and III,

respectively), both of which are premised on the argument that Defendants failed to make

adequate disclosures relating to the Plans. (*See, e.g.*, D.I. 18 at ¶ 98 (alleging that the payment of

non-tax-deductible compensation under the Plans constitute waste); *id.* at ¶ 104 (alleging that the

"Individual Defendants have been or will be unjustly enriched as a result of their acceptance of

bonuses under compensation plans that were insufficiently disclosed to the stockholders"))

---

[16]    It is worth noting here that there is another test under Delaware law used to evaluate demand futility—the *Rales* test—that is employed when the subject of a derivative suit does not constitute a business decision by the board, or when a plaintiff challenges board inaction. *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). Under *Rales*, a shareholder establishes demand futility if the complaint pleads particularized facts that create a reasonable doubt that, as of the time the complaint was filed, a majority of the board could have properly exercised its independent and disinterested business judgment in responding to a demand. *Id.* at 933-34. Some courts analyzing demand futility with respect to allegations regarding the dissemination of false and misleading statements apply the *Rales* test. *See, e.g.*, *In re HP Derivative Litig.*, No. 5:10-cv-3608 EJD, 2012 WL 4468423, at \*12 (N.D. Cal. Sept. 25, 2012); *In re VistaCare, Inc., Derivative Litig.*, No. CIV 04-1740-PHX-RCB, 2007 WL 2460610, at \*3 (D. Ariz. Aug. 23, 2007). It appears that these courts do so because they do not view the allegations regarding dissemination of the alleged misrepresentations at issue as amounting to actual business decisions made by members of the board. *See, e.g.*, *Canty v. Day*, Nos. 13 Civ. 5629 (KBF), 13 Civ. 5977 (KBF), 2014 WL 1388676, at \*6 & n.5 (S.D.N.Y. Apr. 9, 2014); *In re HP Derivative Litig.*, 2012 WL 4468423, at \*12. Since Plaintiffs do not argue that the *Rales* test applies, (*see e.g.*, D.I. 23 at 12), they do not attempt to articulate how, even if the test were applicable, it would be met based on the allegations in the Complaint. One way in which plaintiffs can meet the *Rales* test, for example, is "by pleading facts sufficient to support a reasonable inference that a majority of directors face a substantial likelihood of personal liability for the claims alleged in the complaint." *Silverberg ex rel. Dendreon Corp. v. Gold*, C.A. No. 7646-VCP, 2013 WL 6859282, at \*9 (Del. Ch. Dec. 31, 2013). Yet "to establish a threat of director liability based on a disclosure violation, plaintiffs must plead facts that show that the violation was made knowingly or in bad faith, a showing that requires allegations regarding what the directors knew and when." *In re Citigroup*, 964 A.2d at 133-34. Plaintiffs have failed to make such allegations here.

Plaintiffs' Complaint alleges that a waste claim is "not protected by the business judgment rule, and therefore, demand is excused" as to it, (D.I. 18 at ¶ 88), and does not specifically address Plaintiffs' failure to make a demand with respect to the unjust enrichment claim.

But at oral argument, Plaintiffs' counsel confirmed that Plaintiffs' position is that the allegations in their waste claim and the unjust enrichment claim were so interconnected with and "bound up with" the allegations of their disclosure claim, that "demand is not required for them either[.]" (Tr. at 67 (citing *Resnik* in support of this assertion)); *Resnik*, 774 F. Supp. 2d at 635 (noting that same demand analysis would suffice for breach of fiduciary duty, waste, and unjust enrichment claims, since they were based on same set of challenged transactions). The Court has, however, rejected Plaintiffs' earlier argument regarding excusal of demand as to Count I's disclosure claim, and so that same argument cannot be the basis to excuse demand as to Counts II and III, either.

Thus, for the same reasons that Plaintiffs have not sufficiently pleaded demand futility as to their disclosure claim, and because they have not otherwise met their burden to set out particularized allegations establishing demand futility for their waste and unjust enrichment claims, they have also failed to satisfy the demand requirement for these remaining claims.

## D.    Conclusion and Nature of Dismissal

For the reasons set out above, Plaintiffs have failed to sufficiently plead demand futility. In light of the Court's conclusion in that regard, it need not reach Defendants' alternative arguments for dismissal premised upon ripeness and Rule 12(b)(6). *See Ball*, 2014 WL 1018210, at *2 n.3; *Abrams*, 2012 WL 3614638, at *4. The Court recommends that Defendants' motion to dismiss be GRANTED pursuant to Rule 23.1.

Defendants argue that Plaintiffs' Complaint should be dismissed with prejudice on the ground that "Plaintiffs have now had multiple opportunities to amend their Complaint but nonetheless remain unable to fix fatal infirmities in their pleading[.]" (D.I. 25 at 25; *see also* D.I. 22 at 38; Tr. at 13-14 (Defendants' counsel stressing that dismissal with prejudice is warranted since Plaintiffs have already filed three complaints)) However, Plaintiffs' first amended complaint (the Verified Consolidated Complaint) was filed simply in response to consolidation of this action. (D.I. 12) Plaintiffs filed the current Complaint (the Verified Amended Consolidated Complaint) in lieu of a response to an earlier-filed motion to dismiss. (D.I. 18) Thus, this is the first instance in which a court has found Plaintiffs' allegations to be insufficient and where Plaintiffs would now be attempting to overcome those identified deficiencies (if possible to do so).

As it is within the Court's discretion to grant leave to amend, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), because amendment should be allowed "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), and because it is not clear that amendment would cause undue prejudice or would be futile, the Court recommends that Plaintiffs be given leave to file an amended complaint addressing the deficiencies outlined above. *See, e.g., Abrams*, 2012 WL 3614638, at *1, *4 (dismissing plaintiff's claims pursuant to Rule 23.1, but granting plaintiff leave to amend, despite fact that plaintiff had already filed two complaints).

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that the District Court GRANT Defendants' Motion without prejudice. The Court also recommends that if the District Court affirms this Report and Recommendation, that: (1) Plaintiffs be given fourteen (14) days from

33

the date of affirmance to file a further amended complaint that addresses the deficiencies cited herein; and (2) failure to do so shall give rise to dismissal with prejudice.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: June 10, 2014

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

34